**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

BETTY MASON ARNOLD, ET AL.                    CIVIL ACTION NO. 11-0009

VERSUS                                                          JUDGE S. MAURICE HICKS, JR.

NATIONAL CASUALTY CO., ET AL.            MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

Before the Court are two motions: (1) Regions Bank's Motion for Trustee's Instructions (Record Document 110); and (2) Motion for Relief from Orders Pursuant to Rule 60 of the Federal Rules of Civil Procedure (Record Document 125) filed by Plaintiff Claude A. Newsome ("Newsome").  Both motions came on for hearing on January 27 & 28, 2015.  See Record Documents 142-143.  Regions Bank and Newsome also filed pre-trial and post-trial memoranda.  See Record Documents 137, 140, 146 & 147.

The Court will consider the Rule 60(b) Motion first, as Newsome argues that the Court was without authority to place his settlement proceeds into trust (the "Trust") and seeks the dissolution of said Trust.  If the Court grants the Rule 60(b) Motion, then it need not reach the Motion for Trustee's Instructions.  However, if the Court denies the Rule 60(b) Motion, then it will proceed to the Motion for Trustee's Instructions, which seeks direction and instruction with regard to the administration of the trust.

**BACKGROUND**

On November 23, 2010, Newsome was severely injured in an automobile accident in Bossier Parish.  As a result of the accident, he was rendered a C-4 ASIA-A quadriplegic. See Howard Katz, M.D., Trial Deposition at 32.  Newsome was legally blind even prior to

the November 2010 accident.

On November 26, 2010, Newsome executed a "General Power of Attorney" in favor of Robert Eugene Lansdale ("Lansdale"), granting Lansdale, *inter alia*, the specific power to represent Newsome in legal proceedings.  <u>See</u> Linder 5 (Regions Deposition Exhibits - Volume I).  Lansdale, as Newsome's mandatary, executed a "Contingency Fee Agreement" with Norman R. Gordon ("Gordon"), engaging Gordon to represent Newsome in connection with the automobile accident.  <u>See</u> Record Document 99-2.

On December 2, 2010, Gordon filed suit in the 26th Judicial District Court, Bossier Parish, Louisiana, against various defendants.  <u>See</u> Record Document 125-2.  The lawsuit was filed on behalf of "Robert Eugene Lansdale, as curator of Claude Allen Newsome."  <u>See id.</u> On December 13, 2010, Gordon filed a "Petition for Limited Interdiction" in the 26th Judicial District Court, Webster Parish, Louisiana, seeking an order of limited interdiction for Newsome.  <u>See</u> Lansdale 6 (Regions Deposition Exhibits - Volume I).  An order granting the interdiction and appointing Lansdale as "provisional curator" was signed on that same date.  <u>See id.</u>  On January 4, 2011, the personal injury lawsuit was removed to federal court.  <u>See</u> Record Document 1.

On September 13, 2012, Newsome's deposition was taken and he confirmed that Lansdale was acting as his representative in the lawsuit pursuant to the General Power of Attorney.[1]  On January 29, 2013, Lansdale's deposition was taken and he confirmed that he was acting as Newsome's representative in the lawsuit pursuant to the General Power

---

[1]At the January 2015 hearing, Newsome testified that Lansdale had been operating as his power of attorney up until December 2014.  <u>See</u> Record Document 148 at 49-50. He further stated that Lansdale, under the power of attorney, managed his business affairs. <u>See id.</u> at 82.

of Attorney.  See Robert Eugene Lansdale Trial Deposition; see also Record Document 148 at 89-90.

On January 8, 2014, the Court ordered mediation of Newsome's claims.  See Record Document 72.   The parties mediated their claims and reached a settlement on January 16, 2014.  See Record Document 76 (90 Day Order).  Both Lansdale and Newsome appeared at the mediation.  See Record document 148 at 90.

In early February 2014, this Court set a telephone status conference at the request of counsel.  See Record Documents 77 & 78.  The telephone status conference was set in response to a February 5, 2014 letter from Gordon to the Court:

> We were able to successfully complete a settlement in the claim of Mr. Claude A. Newsome through mediation on January 16, 2014 in Slidell, Louisiana.  As you may recall, Mr. Newsome is a quadriplegic who is totally dependant [sic] upon others.
>
> Our office was retained by Robert Eugene Lansdale, Curator/Power of Attorney of Claude Newsome.  Mr. Newsome described Mr. Lansdale as his very best friend.
>
> After the settlement was reached on January 16, 2014, I recommended to Mr. Lansdale and Mr. Newsome that we deposit the funds received from the settlement in a Special Needs Trust.  I made this recommendation for Mr. Newsome's welfare in an effort to protect his future Medicare and Medicaid benefits.  Additionally, I wanted to make sure this medical trust would extend additional protection against the possibility of the misuse of the funds received.
>
> We received instructions on multiple occasions from the curator, Mr. Lansdale, that the settlement proceeds were not to be placed into a Special Needs Trust.  Instead, he demanded that the settlement documents be sent directly to him and he would make only one trip to Shreveport just to pickup the settlement check.  He advised me that he had consulted "his lawyer" and was told that there was no legal provision that required the funds to be placed in a Special Needs Trust.  He further asserted that there were no laws that would prevent Mr. Newsome from having all of the settlement funds turned over to Mr. Lansdale.  Realizing that a conflict of interest had developed, I notified Mr. Lansdale and Mr. Newsome that I was withdrawing

as the attorney in this matter.

I have had a difficult relationship with Mr. Lansdale throughout my representation of Mr. Newsome.  On many occasions I have looked passed Mr. Lansdale's demands in order to do what was in the best interest of Mr. Newsome.  I have had to confront Mr. Lansdale on several occasions regarding the "misuse" of Mr. Newsome's funds.  On two separate occasions, my firm sent two checks totaling $6,116.30 to Trinity Neurologic Rehabilitation Center after Mr. Lansdale directed Mr. Newsome's SSI checks to be sent to him rather than to that facility.  Of course, the failure to keep this account current jeopardized Mr. Newsome's stay in this facility.  When confronted with [the] situation, Mr. Lansdale stated he was only doing what Mr. Newsome instructed him to do.

I am concerned that Mr. Lansdale will not use all of the settlement proceeds to benefit Mr. Newsome.  Therefore, I ask the Court to consider steps to protect Mr. Newsome from the possibility of undue influence of Mr. Lansdale over Mr. Newsome.  Enclosed is a copy of a letter that I sent to Mr. Lansdale on April 3, 2013.  The content of this letter is disturbing and raises the issue of whether it is to the best interest of Mr. Newsome for Mr. Lansdale to receive the proceeds of the settlement; and, whether Mr. Lansdale should remain Mr. Newsome's curator.

. . .

Yesterday, having again received information that gave me some additional concerns, I advised Mr. Lansdale by e-mail and certified mail that I was withdrawing as the attorney for Mr. Newsome.  There is a conflict of interest that has developed in my continuing to represent Mr. Newsome if it requires me to go through Mr. Lansdale.

I also advised Mr. Lansdale not to contact the defendant attorney, Jay Penny, but he did so any way.  Mr. Penny contacted me immediately upon receipt of Mr. Lansdale's call to say that he advised Mr. Lansdale that he could not speak with him.  Mr. Penny and I discussed this matter and agreed that the Court should be put on notice of this latest development and to seek further instructions.

It is my request that a phone conference be set up by the Court to discuss this matter to include the following:

        a)      Will the court entertain my Motion to Withdraw as the attorney of record for Mr. Claude A. Newsome?

        b)      Will the court issue an order directing that my fees and

expenses be paid from the settlement proceeds?

c)    Will the court entertain a Motion to Remove Robert Eugene Lansdale as Mr. Newsome's curator/power of attorney?

d)    Will the court consider appointing an Independent curator to administer the funds of Claude A. Newsome.

Regions 22 (Motion Hearing).  During the February 19, 2014, telephone status conference, the Court ordered the attorneys "to begin the process of creating a special needs trust/medicare set aside in relation to the funds received from the settlement of . . . Newsome's claims."  Record Document 79.[2]

On February 27, 2014, the Court held another telephone status conference.  See Record Document 81.  Gordon advised that he had retained (1) Regions Bank to serve as the corporate trustee of the settlement funds of Newsome and (2) Mr. Joel Mendler ("Mendler") to prepare the trust documents.  See id.  The Court directed Gordon to submit a proposed order appointing Regions Bank as corporate trustee and Ms. Stella Jean Godley ("Godley") as trustee over Mr. Newsome's person.  See id.  The Court also stated that "the trust should contain a sub-account with the medicare set aside."  Id.

On March 17, 2014, the Court entered an order appointing Regions Bank "as the corporate trustee over the settlement funds and property of Plaintiff Claude Allen Newsome" and Godley "as the trustee over Plaintiff Claude Allen Newsome's person."

---

[2]During the January 2015 evidentiary hearing, defense counsel John William Penny, Jr. ("Penny") testified that Gordon's February 5, 2014 letter was "something to be discussed at the conference."  Record Document 148 at 94.  Penny recalled that the focus of the February 19th conference was "Mr. Gordon's concerns about Mr. Lansdale" and Newsome "being taken advantage of."  Id. at 122.  During the hearing, the Court also characterized the February 5, 2014 letter as the "letter that would result in status conferences and difficulties."  Record Document 149 at 329.

Record Document 87. Godley was also authorized to execute any and all settlement documents on Newsome's behalf and to make any decisions to address his medical needs. See id. The Court also directed that the trust was to contain a sub-account with the medicare set aside. See id.

On March 24, 2014, Paul M. Newton, Jr. ("Newton") filed a motion seeking to substitute himself as counsel of record for Newsome and asking the Court to reconsider its order of March 17, 2014. See Record Document 92. The Court denied such motion on March 31, 2014, stating:

> This Court was aware of Mr. Gordon's February 2, 2014 letter to Plaintiff Claude A. Newsome and, more specifically, Mr. Gordon's desire to withdraw as counsel. Such matters were discussed at the telephone status conference held on February 19, 2014. Mr. Gordon's request was denied by this Court at that time and he was advised that he would not be permitted to withdraw as counsel at this stage of the proceeding.

Record Document 95.[3] The Court viewed the issues between Gordon and Lansdale at this point to be a difference of opinion rather than an actual conflict of interest.

The Court held another telephone status conference on April 10, 2014, and ordered defense counsel to deposit into the registry of the court all settlement funds relating to Newsome no later than Monday, April 21, 2014. See Record Document 97. The Court further ordered that the trust documents identifying Gloria Craig ("Craig"), Newsome's

---

[3]In a footnote, the Court explained:

> Whether an attorney should be allowed to withdraw in a given case is a matter entrusted to the sound discretion of the court and will be overturned on appeal only for an abuse of that discretion. See Broughten v. Voss, 634 F.2d 880, 882-883 (5th Cir.1981).

Record Document 95.

mother, as "settlor" be revised to reflect that Craig had a curatrix.  See id.  The Court suggested to Gordon that the curatorship for Craig be terminated.  See id.

On April 17, 2014, the trust instrument was executed by Craig, as settlor, and J. Edgerton Pierson, Jr. ("Pierson"), on behalf of Regions Bank, as trustee.  See Record Document 99-3.  The preamble of the Trust provided:

> GLORIA L. CRAIG, in her capacity as parent of CLAUDE ALLEN NEWSOME
> and pursuant to Order of the United States District Court, Western Division
> [sic] of Louisiana (Shreveport Division).

Id.

On April 24, 2014, Mr. Gordon filed a "Motion for Disbursement of Registry Funds," requesting that the $7.4 million deposited into the registry of the court on behalf of Newsome be disbursed, with the balance after all fees, expenses, liens, and set asides to be transferred to the Trust.  See Record Document 99.  Attached to the motion were the following exhibits:  a proposed order; the contingency fee agreement; the Trust Instrument; Liability Medicare Set-Aside Allocation letter of March 10, 2014; Center for Medicare and Medicaid Services letter of March 5, 2014, addressing Medicare lien; State of Louisiana letter of March 28, 2014, addressing Medicare lien; and Humana letter of February 28, 2014, addressing a lien.  See id., Exhibits 1-7.  On April 25, 2014, the Court entered an Order disbursing $3,879,835.67 to the Trust.  See Record Document 100.  A Medicare Set-Aside of $345,081 was transferred to the Center for MSA Administration for the benefit of Newsome.  See id.  Upon the parties' joint motion, an Order of Dismissal was entered by this Court on May 7, 2014.  See Record Document 102.

On May 1, 2014, Godley, "as trustee for [Newsome]," executed a Revocation of Mandate, revoking Newsome's November 26, 2010, General Power of Attorney to

Lansdale.  Regions 12 (Motion Hearing).  On May 12, 2014, Godley filed a "Motion to Amend Interdiction Proceedings" in the 26th Judicial District Court, Webster Parish, Louisiana, citing this Court's orders and seeking to have herself appointed curator of Newsome's person and Regions Banks appointed "trustee over the settlement funds obtained on behalf of [Newsome] related to the automobile accident."  Record Document 125-10 at 64-70.  The state court entered an Amended Order of Interdiction as prayed for by Godley on the same date.  See id. at 71.  On November 3, 2014, Newsome obtained a "Consent Judgment" from the 26th Judicial District Court, Webster Parish, Louisiana, which vacated all previously entered orders of interdiction.  See id. at 73-75.

On November 5, 2014, in light of Newsome's challenges to the Trust, Regions Bank moved to intervene.  See Record Document 103.  The Court granted such motion on November 24, 2014.  See Record Document 109.  On that same date, Regions Bank filed the instant Motion for Trustee's Instructions, which was set for evidentiary hearing on January 27, 2015.  See Record Documents 110 & 111.  During a telephone status conference on December 19, 2014, the Court granted an oral motion for Gordon to withdraw as counsel for Newsome and likewise granted an oral motion for Henry W. Kinney, Don M. Richard, and Aaron N. Maples of the law firm Kinney, Ellinghausen, Richard & DeShazo to be added/substituted as counsel for Newsome, all in accordance with Local Rules 83.2.11 and 83.2.12.  See Record Document 126.  The Court further instructed that any Rule 60 Motion filed by new counsel for Newsome would be heard at the January 27, 2015 hearing.  See id.  Counsel for Newsome filed the instant Rule 60(b)(6) Motion on December 19, 2014.  See Record Document 125.

On December 21, 2014, Newsome executed a "Revocation of Mandate," revoking

the November 26, 2010 General Power of Attorney in favor of Lansdale.  See Regions 14

(Motion Hearing).  On December 29, 2014, counsel for Newsome informed the Court via

email that "[Newsome] had been acting under the supposition that the power of attorney

granted to [Lansdale] in 2010 was revoked by [Godley], the court appointed trustee over

his person.  Nevertheless, the attached, witnessed by Mr. Henry Kinney, serves to clarify

that the power of attorney is indeed revoked."  Id.

## LAW AND ANALYSIS

**I.    Rule 60 Standard.**

Federal Rule of Civil Procedure Rule 60(b) provides:

On motion and just terms, the court may relieve a party or its legal
representative from a final judgment, order, or proceeding for the following
reasons:

(1)    mistake, inadvertence, surprise, or excusable neglect;

(2)    newly discovered evidence that, with reasonable diligence,
could not have been discovered in time to move for a new trial
under Rule 59(b);

(3)    fraud (whether previously called intrinsic or extrinsic),
misrepresentation, or misconduct by an opposing party;

(4)    the judgment is void;

(5)    the judgment has been satisfied, released or discharged; it is
based on an earlier judgment that has been reversed or
vacated; or applying it prospectively is no longer equitable; or

(6)    any other reason that justifies relief.

F.R.C.P. 60(b).  "The burden of establishing at least one of these exacting substantive

requirements is on the movant, and determination of whether that showing has been made

is within the discretion of the court."  Resolution Trust Corp. v. Holmes, 846 F.Supp. 1310,

1314 (S.D. Tex. 1994); see also Templet v. HydroChem, Inc., 367 F.3d 473 (5th Cir. 2004). A Rule 60(b) motion "is an extraordinary motion, and the requirements of the rule must be strictly met."  Longden v. Sunderman, 979 F.2d 1095, 1102 (5th Cir. 1992).  "Courts are disinclined to disturb judgments under the aegis of Rule 60(b)."  Pease v. Pakhoed Corp., 980 F.2d 995, 998 (5th Cir. 1993).

## II.    Legal Standards Relating to Trustee's Motion.

As referenced above in the Background Section of the instant ruling, this Court ordered the creation of the Trust for the settlement funds of Newsome.  This Court has continuing jurisdiction to enforce its orders, including the orders relating to the creation of the Trust.  See 28 U.S.C. §1651(a).[4]  In Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 114 S. Ct. 1673 (1994), the Supreme Court held that ancillary jurisdiction enables "a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees."  Id. at 379-380, 114 S.Ct. at 1676.

Additionally, the Trust Instrument at issue in this case provides that "this trust and all dispositions thereunder shall be governed by and interpreted in accordance with Louisiana law," i.e., the Louisiana Trust Code, La R.S. 9:1721, *et seq.*  Record Document 99-3 at 8.  The Louisiana Trust Code provides:

> A trustee, a beneficiary, or a settlor in an ordinary or a summary proceeding may apply to the proper court for instructions concerning the trust instrument, the interpretation of the instrument, or the administration of the trust.

La. R.S. 9:2233(A).

---

[4]Section 1651(a) provides that "the Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

Based on the foregoing, this Court has jurisdiction to resolve the two pending motions.

## III.    Analysis.

### A.    Rule 60(b) Motion.

Newsome makes three arguments in his Rule 60(b)(6) motion:

- There is absolutely no authority in state or federal law for the taking of his settlement proceeds to establish a special needs trust;

- The Trust is absolutely null because Craig, the settlor of the trust, was an interdict at the time the Trust was created; and

- The Order appointing Godley as trustee over the person and Regions Bank as the corporate trustee are absolutely null because the state law procedures for modification of a judgment of interdiction were not complied with.

Record Document 125.  The Court will address each of these arguments, again bearing in mind that the burden of establishing at least one of the exacting substantive requirements set forth in Rule 60(b) is on the movant, Newsome.  See Resolution Trust Corp., 846 F.Supp. at 1314; Templet, 367 F.3d 473.

### 1.    Summary of Newsome's Testimony at January 2015 Hearing.

During his testimony, Newsome gave historical information regarding his background.  He stated that he had a Bachelor's Degree in Biblical Studies from Mississippi College.  See Record Document 148 at 28-29, 85.  He explained that he had been receiving Social Security Disability Income ("SSDI") prior to the  accident due to his sight impairment.  See id. at 30-31, 45.[5]  He also stated that while he currently has Medicare

---

[5]During his testimony, Newsome stated that his legal blindness is because of macular degeneration, plus other eye problems such as myopic astigatism, cataracts, and corneal problems.  See Record Document 148 at 60.  Even with glasses, Newsome

benefits, he has never applied to receive Medicaid benefits through the State of Mississippi.
See id. at 45-46.[6]

Newsome explained that he required help getting dressed each day, had dietary
restrictions, had to be fed by an aide, and could not open his own mail.  See id. at 66-69.
He testified that he had not had a bank account since before the accident, over four years
ago.  See id. at 46-47.  Before the accident, he would read bank statements with electronic
equipment that enlarged the print.  See id. at 47.  He explained that the font size would
need to be at least 20 for him to read directly in front of him.  See id. at 61-62.  Newsome
testified that the engagement letter with his current counsel had to be read to him by that
same counsel.  See id. at 52.  Newsome has never had an account with a brokerage house
and never had a financial advisor.  See id. at 48.  He does not have a credit card or a debit
card and the largest check he has ever written was for his monthly truck payment of
approximately $500.  See id. at 72, 75.  When questioned by the Court, Newsome admitted
that the largest financial decisions he had made were tuition payments and the purchase
and financing of his truck.  See id. at 84-85.

---

testified that his "better eye is worse than 2200 and [his] other eye is 2400."  Id. at 63.  The
Court interpreted this statement as "20/200" in the better eye and "20/400" in the weaker
eye.

[6]Newsome explained that he did not have Medicare benefits "now" because he was
out of the facility for the hearing.  See Record Document 148 at 46-46.  He expected to get
back to Boyington, re-enroll and be reinstated.  See id. at 46.
    As to Medicaid, Kristina B. Gustavson, the Regions Bank Trust Advisor, testified that
Newsome was receiving Medicaid while he was living in a facility in Louisiana.  See id. at
213, 214.  However, it appears that Newsome never applied for Medicaid once he moved
to Boyington in Mississippi.  See id. at 214, 215.  Gustavson believed that Newsome did
not apply for Medicaid in Mississippi because "he felt that the only reasons that he wasn't
getting money out of the trust or the money they wanted – or the only reason the money
was in trust was because he was receiving federal aid."  Id. at 215.

Newsome testified that he gave cash to Lansdale "from time to time" out of his SSDI check.  See id. at 52.  He also admitted that he had asked Kristina B. Gustavson ("Gustavson"), the Regions Bank Trust Advisor, to have the Trust pay $160,000 to Lansdale as payment for services rendered.  See id. at 52- 53.  Newsome explained:

| | |
|---|---|
| A: | Isn't it – I thought there was a percentage in which he could be paid in his position. |
| Q: | In his position as curator? |
| A: | It – I'm trying to remember if it was POA or – I'm not sure what's the curator part at the time, because when I first heard the terms, I thought they [curator and POA] were one and the same . . . . |
| . . . | |
| THE COURT: | . . . Mr. Newsome, you paid him a percentage of what? |
| THE WITNESS: | Oh. When I was asking for the bank to pay, I thought that he was allowed a percentage of money to be paid to him. |
| THE COURT: | A percentage of what? |
| THE WITNESS: | Oh. Oh.  Excuse me.  Sorry, sir.  A percentage of money to be paid to him. |
| THE COURT: | On deposit in Regions? |
| THE WITNESS: | Yes. |
| THE COURT: | Or that you received in toto as part of the settlement? |
| THE WITNESS: | I was thinking that it was part of what I received. |
| THE COURT: | What was the percentage? |
| THE WITNESS: | Payment was – could be  – was it 1 or 2 percent? Something like – something along those lines. |
| THE COURT: | 1 or 2 percent? |

| THE WITNESS: | It would have to be reread to me.  It's been a while since – since I – since I heard it. |
|---|---|
| THE COURT: | All right.  And this was what you communicated to Regions to justify the payment to Mr. Lansdale? |
| THE WITNESS: | Yes, sir. |
| THE COURT: | Was there a written agreement between you and Mr. Lansdale for the payment of this so-called percentage? |
| THE WITNESS: | No, sir. |
| THE COURT: | How did you determine 1 or 2 percent was proper? |
| THE WITNESS: | I'm trying to remember that.  It was – I remember something of that sort being read to me.  I may be mistaken.  It has been a while. |
| THE COURT: | Someone read that to you? |
| THE WITNESS: | I thought it was written, read to me, yes, sir, that – that a certain percentage could be given to the POA and/or curator, as he's telling me. |
| THE COURT: | But for a $160,000 payment, you don't remember who read that to you? |
| THE WITNESS: | Do not.  It has been a while now, sir.  I'm sorry. |
| THE COURT: | All right.  Thank you. |

Id. at 53-55.  Newsome also testified that he asked Gordon to pay Lansdale $2,800 per month, in addition to the $160,000 previously discussed.  See id. at 57.  Newsome believed the monthly amount to be a loan from Gordon to Newsome that would be repaid from proceeds from the personal injury lawsuit.  See id. at 56-57.

Newsome also testified that he was lead to believe by Gordon that he would receive $5.2 million from the settlement.  See id. at 32.  He stated that he did not agree to the Trust; he did not wish to remain at the Boyington Nursing Home in Gulfport, Mississippi; he

believes he is capable of managing and handling all of his affairs, including his person and his property; he objects to his property being administered by Regions Bank; he does not believe Godley is capable of making decisions about his welfare and well-being; and he requests all orders concerning his person and property which have been entered by the Court to be declared void.  See id. at 33-34, 41, 44.

### 2.    Summary of Dr. Howard Katz, M.D.'s Trial Deposition.

Dr. Katz's residency was in physical medicine and rehabilitation.  See Howard Katz, M.D., Trial Deposition at 6.  He is board certified in those same areas.  See id. at 6-7.  He is also board certified in the subspecialty of spinal cord injury medicine and brain injury medicine.  See id. at 7.  Dr. Katz explained that Newsome was referred to him by Gordon for an independent medical evaluation.  See id. at 15.  The evaluation took place on October 31, 2012.  See id. at 16.

Dr. Katz assessed Newsome as a C4 ASIA-A quadriplegic, meaning he has no sensation and no motor control below the middle of his neck.  See id. at 32.  He testified that no brain injuries resulted from the November 2010 car accident and that Newsome has "the ability to direct his own care."  Id. at 20.  Dr. Katz expounded:

> And there's no reason to believe he can't direct his own care.  He was legally blind before his injury.  He's still legally blind.  He has the mental capacity to direct his care. . . .  But in my opinion, to a reasonable degree of medical certainty, he was, on October 31, 2012, completely competent to direct his own care.

Id. at 20-21.  Dr. Katz explained that by "directing his own care," he means Newsome is capable of telling healthcare providers to give his medicine, decide which medicine to take, and make his own decisions as far as what health decisions will be made.  See id. at 21. He further testified that he didn't think Newsome was incompetent and that depression may

affect some of Newsome's mental functions.  See id. at 19-20.

Dr. Katz explained that Newsome can use "aid-level care," but "he needs help because he can't see, but otherwise, he is capable of managing his own care."  Id. at 22. Dr. Katz described Newsome as intelligent and having the capacity to make decisions for himself.  See id. at 23.  However, Dr. Katz also characterized Newsome as "fanciful" at times.  Id. at 24.

As for "Need for Care in the Home," Dr. Katz testified that Newsome would need 24-hour care for the rest of his life.  Id. at 26.  Alternatively, Newsome could be placed in a long-term residential facility.  See id.  The need for such care is Newsome "is completely dependent on mobility and self care."  Id. at 37.[7]  Newsome has "neurogenic bowel with colostomy" meaning he has no control over his bowel.  See id. 33.  He also has "neurogenic bladder treated with suprapubic catheter." Id. at 33.  Dr. Katz further explained that Newsome is at high risk for decubitus ulcers, osteoporosis, urinary tract infections, kidney stones, bladder stones, vesicoureteral reflux.  See id. at 35, 41, 42.

### 3. The Court Had the Power under Federal Law to Remove Lansdale as Newsome's Representative and Appoint Godley as His Guardian Ad Litem.

At the outset, this Court believes it was entitled to rely upon the facts and circumstances as they were presented by the parties and their counsel.  Since the inception of this litigation in federal court, this Court has been aware of Newsome's profound physical disability and his choice to prosecute his claim through his representative, Lansdale.  From

---

[7]Dr. Katz explained that Newsome can't scratch his own nose, go to the bathroom, clean himself, feed himself, cough, or administer medications.  See Howard Katz, M.D., Trial Deposition at 38.

the Court's perspective, Lansdale was controlling the litigation, presumably because Newsome needed or preferred Lansdale's assistance due to his severe physical disabilities.[8]

In February 2014, this Court received a letter from Gordon stating that he was concerned that Lansdale would not use all of the settlement money to benefit Newsome. Gordon also referenced the undue influence of Lansdale and described two instances where Lansdale had "misused" funds by directing Newsome's SSDI checks to be sent to Lansdale, not the facility.  See Regions 22 (Motion Hearing).  This letter was the basis of this Court's belief that Lansdale's interests and his actions were not aligned with the best interests of Newsome.

Pursuant to Rule 17(c), courts have consistently recognized that they have inherent power to appoint a guardian ad litem when it appears that a minor's or incompetent person's general representative has interests which may conflict with those of the person he is supposed to represent."  Adelman on Behalf of Adelman v. Graves, 747 F.2d 986, 988 (5th Cir. 1984).  "The district court's power to appoint a guardian ad litem under Rule 17(c)(2) has been broadly interpreted and has not been limited by a narrow construction of the words infant or incompetent person.  In determining the extent of its power under Rule 17(c), the court should be guided by its appraisal of the particular party's ability to protect his interests in the litigation adequately."  6A Fed. Prac. & Proc. Civ. § 1570 (3d ed.).  In Chrissy F. by Medley v. Mississippi Dep't of Pub. Welfare, 883 F.2d 25 (5th Cir.

---

[8]The Court notes that in the pre-trial memorandum, while counsel for Newsome argued that he was never validly interdicted, counsel referred to "his status as a putative interdict."  Record Document 137 at 22.

1989), the Fifth Circuit noted that "however worthy and highminded the motives of 'next friends' may be, they inevitably run the risk of making the actual [party] a pawn to be manipulated on a chess board larger than his own case." Id. at 27.  In this instance, based on the specific facts of this case, the Court exercised its power under Rule 17(c) to remove Lansdale and appoint Godley as trustee over Newsome's person, i.e., his guardian ad litem, because this Court perceived that Lansdale's interests conflicted with those of Newsome.[9]

The Court further finds that the testimony adduced at the hearing supports its belief that Lansdale was acting in direct conflict with the best interests of Newsome.  Both Lansdale and Newsome admitted that, from time to time, Lansdale will accept cash payments from Newsome from Newsome's monthly SSDI check, Newsome's only source of income.  See Record Document 148 at 52; Robert Eugene Lansdale Trial Deposition at 73-75.  Godley, Newsome's aunt, testified that she didn't trust Lansdale because "he's told too many lies.  And just does things."  Record Document 148 at 184.  Craig, Newsome's mother, testified that she was concerned about Lansdale's influence on her son.  Record Document 148 at 193.  She stated that her concerns extended to Newsome's money.  See id. at 194.  During his testimony, Gordon stated that he had concerns regarding Lansdale's actions dating back to 2011, when his firm first had to send a check to the facility housing

_____

[9]Newsome has argued that the Order appointing Godley as trustee over the person and Regions Bank as the corporate trustee was absolutely null because the state law procedures for modification of a judgment of interdiction were not complied with.  However, as set forth *supra*, irrespective of state law interdiction procedure, this Court had the power under Rule 17(c) to remove Lansdale and appoint Godley as trustee over Newsome's person, i.e., his guardian ad litem.  The appointment of Regions Bank as corporate trustee will be addressed in conjunction with whether the Court had the authority to place the settlement funds in trust.

Newsome because Lansdale directed Newsome's SSDI check to be sent to him rather than the facility.  See Record Document 149 at 353; Regions 22, Exhibit 1.  In his trial deposition, attorney John V. Woodfield[10] ("Woodfield") testified that he became concerned that Lansdale might not be acting in Newsome's best interest.  See John V. Woodfield Trial Deposition at 10-11.  Woodfield further stated that Lansdale stopped by his office almost daily to ask questions "primarily due to money."  Id. at 11.  Woodfield recalled that Lansdale became more aggressive and always claimed the trust owed him a little less than $200,000 for services that he allegedly rendered.  See id. at 11, 12.  Woodfield also testified that Lansdale referred to the money in the trust as "our money," not Newsome's money.  Id. at 13.  The Court also heard testimony from Gustavson regarding an exchange between Woodfield and Lansdale in October 2014 regarding the $35,000 fee referenced in the disbursement order.  See Record Document 148 at 208-210.  Woodfield explained that "Lansdale said, essentially, 'If you can get it returned in cash to me, I'll kick you back some.'"  Id.[11]  Thus, the evidence adduced at the January 2015 hearing confirmed this Court's earlier beliefs, based on Gordon's February 5, 2014 letter and its attachments, that Lansdale's interests and actions were in conflict with the best interests of Newsome.

_____

[10]Woodfield, a Mississippi attorney, was engaged to represent Newsome sometime in early 2014.  See John V. Woodfield Trial Deposition at 5.  Lansdale contacted Woodfield, who would not agree to the representation until he met Newsome in person.  See id. at 5-6. While there was no engagement letter, Woodfield stated that he always made it very clear that he represented Newsome, not Lansdale.  See id. at 6, 8.  Newsome engaged Woodfield to have the interdiction lifted in Louisiana.  See id. at 7.Woodfield was "terminated later in 2014" by both Lansdale and Newsome.  Id. at 7-8.

[11]This testimony drew a hearsay objection from Newsome's counsel.  Such objection was overruled pursuant to Federal Rule of Evidence 801(d)(2).  See Record Document 148 at 209-210.

### 3. The Court Had the Authority to Place the Settlement Funds in Trust.

Newsome argues that there is absolutely no authority in state or federal law for the taking of his settlement proceeds to establish a special needs trust.  His first argument is based on Louisiana Code of Civil Procedure Articles 4566 and 4269.1.  Newsome argues that these articles were not complied with in the formation of the Trust at issue.  Article 4566 provides, in pertinent part:

> A curator may place the property of the interdict in trust in accordance with the provisions of Article 4269.1.  The trust shall be subject to termination at the option of the interdict upon termination of the interdiction, or if the interdict dies during the interdiction, at the option of his heirs or legatees.

La. C.C.P. Art. 4566(D).  Article 4269.1 provides:

> At any time during his administration a tutor may apply to the court for authorization to place some or all of the minor's property in trust for administration, management and investment in accordance with the Louisiana Trust Code. The trust instrument shall name the minor as sole beneficiary of the trust, shall name a trustee, shall impose maximum spendthrift restraints, and shall be subject to termination at the option of the beneficiary upon attaining the age of majority or, should he fail to attain majority, at the option of his heirs or legatees. The court may, upon application, make such changes in the trust instrument as may be advisable. Upon creation of the trust, the tutor shall be entitled to no further commissions with respect to the trust property.

La. C.C.P. Art. 4269.1.  Collectively, these articles allow a curator, with court approval, to place the property of an interdict in trust.  The trust must be subject to termination at the option of the interdict upon the termination of the interdiction.  On their face, these articles do not apply to the instant matter, as the curator did not place the property of the interdict in trust.  Rather, the trust in this case was created and funded by court order.[12]

---

[12]Attorney Joel Mendler testified in his trial deposition that "the judge's order trumps the Code of Civil Procedure."  Joel A. Mendler Trial Deposition at 109.

Next, Newsome argues that there is absolutely no federal statutory authority for mandating the establishment of a special needs trust against his will.  The Court disagrees, as there are two sources of federal authority for the Trust created in this case: federal common law and Title 42, United States Code, Section 1396p(d)(4)(A).

The Best Interest of the Litigant Standard

Hull by Hull v. U.S., 971 F.2d 1499 (10th Cir. 1992) guides the Court as to its inherent authority under federal common law.  In Hull, the parents of a handicapped minor child brought a civil action for monetary damages against the government pursuant to the Federal Tort Claims Act ("FTCA").  See id. at 1501.  The government admitted liability and causation.  See id. at 1502.  The court appointed a guardian ad litem and, after a bench trial, awarded $8,414,063.87 in damages.  See id.  While the court instructed the government to pay the parents directly for their pain and suffering, the court  ordered that the damages awarded to the victim be placed in a trust fund managed by a third-party trustee.  See id.  Specifically, the court wanted to establish a trust that would revert fully to the government upon the victim's death because "[the court] was concerned that [the victim's] safety would be in jeopardy if his parents were to receive the unspent portion of this damage award upon [his] death."  Id.  Yet, the district court "believed that it lacked the power to impose a full reversionary provision absent the consent of the parents," and instead imposed only a partial reversionary provision.  Id.

On appeal, the Tenth Circuit found that the district court's inherent authority was not so limited, reasoning:

> [District courts have] inherent authority to structure awards or to impose trusts or reverter conditions to ensure that the damage recovery is in the best interest of the victim.  Indeed, it would be incongruous for the

recovery to place the victim's life in jeopardy.  *See Reilly v. U.S.*, 863 F.2d 149, 170 (1st Circ. 1988) ("[I]t cannot be doubted that the court has power (1) to ensure that the recovery benefits the victim, and (2) to exercise strict supervision over investment and use of the funds if the victim is a legal incompetent or ***otherwise in need of protection***."). . . .

Thus, we hold that the district court has the inherent authority to order that [the victim's] damages be paid in the form of a fully reversionary trust if it concludes that is in [the victim's] best interest, so long as the government's obligation to [the victim] ceases when it pays a fixed lump sum to fund that trust.  In determining whether such a trust is appropriate on remand, the court should consider what form or structure of damages best serves [the victim's] interests from [the victim's] perspective only.  . . .   The award is to compensate [the victim], and [the victim] only. . . .

The fact that [the victim] consented to a fully reversionary trust through his legal representative, the guardian ad litem, is a highly relevant consideration because [the victim] is the real party in interest. . . .  Because the guardian ad litem – and not the parents – represents [the victim], her consent is the relevant consideration.  The parents' refusal to consent to a fully reversionary trust is irrelevant, particularly in light of their alleged conflict of interest in this case.

Hull, 971 F.2d at 1505-1506 (some internal citations omitted) (emphasis added).  The Tenth

Circuit remanded the case with the following instruction:

Ultimately, the district court has the inherent power to ensure that [the victim] obtains the maximum benefit from his award.  Accordingly, we remand to give the district court an opportunity to approve the establishment of a new trust that includes a full reversionary interest to the government if the court still desires to do so.  If the court decides a new trust is unnecessary, we ask the court to consider (1) minor changes that might lessen the tension between [the victim's] interests and the parents' interests (for example, the government suggests that the court might provide the parents with reasonable access to trust funds to pay family expenses); (2) a provision whereby the government will be reimbursed for services that the Indian Health Service renders to [the victim] in the future; and (3) the appointment of a different guardian ad litem, as requested by the current guardian ad litem.  The court's decision as to the structure of the award will be reviewable only for an abuse of discretion.

Id. at 1506.  The Tenth Circuit also noted that the district court, on remand, "may of course

reconsider any arguments regarding the trust agreement."  Id. at 1506, n. 6.  The appellate

court further observed "that the district court retained the power to clarify the trust provisions if requested to do so by the trustee or the parents."  Id.

Newsome argues that Hull is distinguishable because it is specifically limited to FTCA claims.  See Record Document 137 at 24.  This contention fails because the Court's inherent power and authority is grounded in federal common law, not the FTCA as codified in 28 U.S.C. § 1346.  Moreover, Regions Bank has pointed the Court to EEOC v. CED Entertainment, Inc., No. 98-C-698-X, 2000 WL 1339288, at *29 (W.D. Wis. Mar. 14, 2000), an American with Disabilities Act case, wherein the court stated:

> Plaintiffs argue that this court has the inherent authority to order that [plaintiff-intervenor's]  monetary award be deposited into a supplemental needs trust if it finds that it is in [plaintiff-intervenor's] best interests to do so.  However, plaintiffs do not ask this court simply to order that the funds be deposited into a trust that already exists, but are asking the court to establish the trust.  Recognizing that I may indeed have the authority to establish such a trust and that such a trust appears to be in [plaintiff-intervenor's]  best interests, I am nonetheless declining to enter plaintiff-intervenor's proposed order.

Id.  Additionally, Newsome contends that Hull requires a hearing such that the beneficiary of the trust is afforded the benefit of due process.  See Record Document 137 at 24.  While the Court does not believe that Hull requires such hearing, the two day evidentiary hearing held in January 2015 satisfies any such requirement.

This Court believes that it was a proper exercise of its inherent authority to place the settlement funds of Newsome in a trust.  The Hull court referenced Reilly, 863 F.2d at 170, for the principle that the court has the power to "exercise strict supervision over investment and use of the funds if the victim is a legal incompetent or ***otherwise in need of protection***."  It is this Court's belief that Newsome is in need of protection and placing the settlement proceeds in trust is in his best interest.  While this Court agrees that Newsome

falls within the clinical and technical definition of mental competence, the current status and permanency of his medical condition leads this Court to believe that while he may be capable of participating in some decisions regarding his medical care, he is not capable of fully managing all of his own affairs, especially those related to his finances.  This Court observed Newsome over the course of a two day hearing and believes that his quadriplegia coupled with his legal blindness leaves him vulnerable to predators disguised as friends who simply want to take his money.  Newsome is completely reliant upon others to open his mail and write checks and his eye condition requires the use of special equipment to even review documents.  All of these limitations due to his irreversible, permanent medical condition and his general inexperience with financial matters lead this Court to conclude that he is at a heightened risk for predatory practices in regards to his monetary settlement proceeds.

Special Needs Trust

In addition to the Court's inherent authority under federal common law to act in a tort victim's best interest, Title 42, United States Code, Section 1396p(d)(4)(A)[13] empowers district courts to establish what is generally referred to as a "special needs trust" for

---

[13]Section 1396p(d)(4)(A) provides:

A trust containing the assets of an individual under age 65 who is disabled (as defined in section 1382c(a)(3) of this title) and which is established for the benefit of such individual by a parent, grandparent, legal guardian of the individual, *or a court* if the State will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total medical assistance paid on behalf of the individual under a State plan under this subchapter.

42 U.S.C. § 1396p(d)(4)(A) (emphasis added).

disabled individuals under the age of 65.  "A special needs trust is created for a disabled

individual to allow a trustee to manage assets for the benefit of a disabled person."  ACS

Recovery Servs., Inc. v. Griffin, 723 F.3d 518, 539 (5th Cir.) (Haynes, Circuit Judge, joined

by Reavley, Dennis, and Elrod, Circuit Judges, concurring in part and dissenting in part),

cert. denied sub nom. Larry Griffin Special Needs Trust v. ACS Recovery Servs., Inc., 134

S.Ct. 618 (2013).  A special needs trust must be established for the benefit of the individual

with the disability by a parent, grandparent, legal guardian of the individual, **or a court**.

See id., citing 42 U.S.C.  § 1396p(d)(4)(A) (emphasis added).  The specific "requirements

for establishing and maintaining special needs trusts ensure that they do not operate as a

conduit through which to pass money to the beneficiary or to harbor tainted assets."  Id.

The Fifth Circuit went on to explain:

> The primary purpose of special needs trusts is to allow beneficiaries to
> maintain eligibility for public benefits–such as Medicaid–while supplementing
> those benefits so that the beneficiary enjoys a better quality of life.  Indeed,
> Congress and the states sanction the use of special needs trusts as a lawful
> means of protecting assets to achieve this purpose. This result can be
> achieved because a special needs trust is irrevocable and there are limits on
> the source and use of funds, otherwise the trust principal would be
> considered available to the beneficiary, and the beneficiary would be
> disqualified from public benefits.

Id. at 539-540 (internal citations and quotations omitted).

There is no dispute that Newsome is disabled under the terms of Section

1396p(d)(4)(A).[14]  Yet, Newsome now appears to argue that the instant Trust is invalid

because (1) it is not a special needs trust; and (2) the Medicare set aside was not made

---

[14]Joel A. Mendler, the attorney who drafted the trust and a specialist in the field of
special needs trusts, testified in his trial deposition that blindness is considered a disability,
as defined by Social Security.  See Joel A. Mendler Trial Deposition at 56, 71-72, 207.

part of the trust as ordered by the Court.  See Record Document 137 at 20-22.  On February 19, 2014, this Court ordered the attorneys "to begin the process of creating a special needs trust/medicare set aside in relation to the funds received from the settlement of Plaintiff Claude Allen Newsome's claims."  Record Document 79.  On March 17 2014, the Court again "ordered that the trust being prepared by attorney Joel Mendler on behalf of Plaintiff Claude Allen Newsome contain a sub-account with the Medicare set aside." Record Document 87.  A copy of the trust and a copy of the Liability Medicare Set-Aside Allocation calculated by The Center for MSA Administration was submitted to the Court on April 24, 2014, as part of the Motion for Disbursement of Registry Funds.  See Record Document 99, Exhibits 3 & 4.  The Medicare Set Aside amount was $345,081.  See Record Document 99, Exhibit 4.  After having reviewed the motion and the attached exhibits, this Court granted the Motion for Disbursement of Registry Funds, thereby tacitly approving both the purely discretionary trust with a contingent special needs provision and the separately administered Medicare Set Aside.  See Record Document 100.

The Court fully acknowledges that the Trust in this matter is a purely discretionary trust with a contingent special needs provision.  See Joel A. Mendler Trial Deposition at 193.[15]  Likewise, the trust does not contain a  sub-account with the Medicare Set Aside. Rather, the Medicare Set-Aside was handled through a separate claims administration. Notwithstanding, this Court believes that because the contingent special needs provision of the trust was created pursuant to 42 U.S.C. § 1396p(d)(4)(A), the trust complies with its

---

[15]Joel A. Mendler testified in his trial deposition that he considered the trust to be "a court-ordered special needs trust" and that the trust was in compliance with this Court's order.  See Joel A. Mendler Trial Deposition at 198, 208.

previous orders.  See id. at 270.  Mendler testified in his trial deposition that the purely discretionary trust with a contingent special needs provision met all the requirements of Section 1396p(d)(4)(A) should Newsome either be receiving Medicaid benefits at that time or desire to receive Medicaid benefits in the future.  See id. at 220.  Mendler stated that he drafted the trust in accordance with the directions of the referring attorney; however, he testified that a purely discretionary trust with a contingent special needs provision is the type of trust instrument he would have recommended as he felt this type of trust would be in the best interest of Newsome.  See id. at 221.  Finally, Mendler explained that there had been no determination in a judicial forum that the money held in escrow as the Medicare Set Aside would jeopardize Newsome's ability to obtain future need-based government benefits such as Medicaid.  See id. at 278.

### 4.    The Trust is Not Absolutely Null Due to Craig's Interdiction.

Newsome argues that the trust is absolutely null because Craig, the settlor of the trust, was interdicted at the time it was created.  This argument fails on multiple grounds. First, on April 11, 2014, this Court was aware of Craig's interdiction and even suggested that Gordon terminate Craig's interdiction and/or that the trust document be revised to reflect that Craig had a curatrix.  See Record Document 97.  On April 17, 2014, Craig executed a "Revocation of Provisional Curatorship," purporting to terminate the interdiction. See Record Document 125-9 at 13.[16]  On the same date, Craig re-executed the same trust

---

[16]The efficacy of Craig's revocation is irrelevant because, to the extent it ever had any effect, her order of temporary interdiction had already expired under Louisiana Civil Code Article 397, which provides:

> The court may modify or terminate a judgment of interdiction for good cause. Interdiction terminates upon death of the interdict or by judgment of the court.

instrument that she had originally executed on March 26, 2014.  It was this trust instrument

that was presented to the Court on April 24, 2014 as part of the Motion for Disbursement

of Funds.  See Record Document 99-3.  Thus, this Court believes that Craig had the

capacity to settle the trust.

　　　　Additionally, in light of the trial deposition of Mendler,  the Court finds that even if

Craig was an interdict at the time she signed the trust instrument, the trust is not absolutely

null due to Craig's interdiction.  See Joel A. Mendler Trial Deposition.  Mendler, who is

recognized as a specialist with expertise in the field of special needs trusts, drafted the trust

at issue in this case.  See id. at 56, 71-72, 176-177.  During his deposition, Mendler

testified that "with respect to a special needs trust, in order to be able to make the

beneficiary eligible for governmental benefits, the federal law requires that the trust be

established by a parent, a grandparent, a legal guardian, or court order."  Id. at 11.  He

further explained:

> They obtained a court order to establish the special needs trust, but I needed
> a settlor, somebody physical on a trust document, to be a settlor to sign the

---

> A judgment of preliminary interdiction granted after an adversarial hearing
> terminates thirty days after being signed, unless extended by the court for
> good cause for a period not exceeding thirty days.  A judgment of temporary
> interdiction granted ex parte terminates ten days after being signed.  On
> motion of the defendant or for extraordinary reasons shown at a contradictory
> hearing, the court may extend the judgment of temporary interdiction for one
> additional period not to exceed ten days.

La. C.C. Art. 397.

Newsome has argued that his state-court order of interdiction was invalid and
"expired ten days after being signed" pursuant to Article 397.  Record Document 125-10
at 12.  Except for names, the documents used to interdict Newsome are identical to those
used to interdict Craig.  Thus, Newsome is judicially estopped from taking the contrary
position that Craig remained interdicted in April 2014.

> trust as a creator of the trust because every trust has a settlor. . . .  Mr. Gordon's office had indicated that . . . a parent was going to be on there, although that parent . . . was not necessary in order to satisfy the federal requirement for a special needs trust because we had a court order.  We sort of double-killed the issue as far as qualifying should the trust be deemed a special needs trust by not only having a court order but also a parent settlor as required by the federal statute.

Id. at 11-12.  As to this case, Mendler testified that even though Craig was interdicted, the trust would not be an absolute nullity in his opinion because "it would be treated as a Court-established trust."  Id. at 15.  According to Mendler, this trust was established by the Court and the Court is the real creator of the trust even though Craig's name is on the instrument.  See id. at 18.  Stated another way, "the trust was established by the Court as the real settlor of the trust in order to satisfy the federal requirement [under 42 U.S.C. § 1396(d)(4)(A)] for a special needs trust."  Id. at 21.  Regions Bank succinctly summed up Mendler's opinion in its pre-trial memorandum, stating:

> [A]s a belt-and-suspenders measure only, Craig was chosen to execute the trust instrument because, as Newsome's parent, she belongs to the class of persons qualified under 42 U.S.C. § 1396(d)(4)(A) to establish a special needs trust.

Record Document 140 at 27; see also Joel A. Mendler Trial Deposition at 222-225.  Mendler testified that the trust at issue is a "dry trust" and it really did not have to be "funded" to meet the requirements of Section 1396(d)/governmental benefits.  See Joel A. Mendler Trial Deposition at 222, 233-234.  Therefore, Newsome's argument that the Trust is absolutely null because Craig, the settlor of the trust, was an interdict at the time the Trust was created fails.[17]

_____

[17]Since their enrollment in December 2014, counsel for Newsome have claimed that Newsome was kept in the dark with respect to the appointment of a new guardian ad litem/trustee over the person and the creation of the Trust.  To the extent he continues with

**5.      Miscellaneous Issues.**

At the conclusion of the January 2015 evidentiary hearing, counsel for Regions Bank raised two issues that had been "interjected into the proceedings" that Regions Bank requested the Court to address: (1) whether Regions Bank, to date, has administered the trust prudently; and (2) whether Regions Bank had any duties to Newsome prior to receiving the settlement funds from the Court.  See Record Document 149 at 470.  The Court ordered post-trial briefs on the second issue only.  See id. at 470-473.

Administration of the Trust in a Prudent Manner

Counsel for Newsome argued at the conclusion of the evidentiary hearing that the of prudent administration had not been "put into play" and that his questioning of Pierson, Gustavson, and/or Jay Binderim could not expand the pleadings.  Record Document 149 at 371.   The Court stated that there was "certainly adequate evidence presented to make a decision under the facts and law," and further noted that it had not heard evidence to indicate that Regions Bank had not been a prudent administrator.  Id. at 370, 372.  The Court noted that it was impressed with and believed that the testimony of Jay Binderim ("Binderim") was "pretty strong, and there's no countervailing testimony."  Id. at 372.

To the extent a ruling is necessary on this issue, the Court finds that through the date of the January 2015 evidentiary hearing, the Trust was administered in a prudent manner.  Binderim serves as a portfolio manager in the Regions Bank Trust Department. See id. at 372-374.  His responsibilities include monitoring trust accounts, rebalancing of investments, participating in the selection of investments, and the process of portfolio

such claims, the Court believes that his grievances are more properly directed towards Lansdale and/or Gordon, not the Court or Regions Bank.

management.  See id. at 373.  Binderim is the portfolio manager for the Trust at issue in this matter.  See id.  In consultation with the trust officer, Binderim helps set the investment objective for each account based on risk tolerance, time horizon, liquidity and other factors. See id.  Binderim is well qualified for those tasks, having received his degree from Centenary College in business and finance in 2006, his MBA from LSU-Shreveport in 2009, and achieving the designation of chartered financial analyst.  See id. at 372.  He testified that a balanced portfolio was selected for the Trust after consideration of a number of factors using a 20-plus year time horizon.  See id. at 374.  Regions 17 was discussed, showing the breadth and diversification of the Trust portfolio.  See id. at 375-376.  A group of 50 portfolio managers participate in making tactical decisions on stocks, bonds, and diversified strategies in order to manage and reduce risks.  See id. at 376-377.

Based on the evidence produced by Regions Bank at the hearing, this Court concludes that, from the creation of the Trust through the end of testimony at the hearing, Regions Bank has acted as a prudent administrator of the Trust.

Commencement of Regions Bank's Duties to Newsome

Regions Bank argues that its duties as corporate trustee only extend to those property interests which were transferred to the trustee in a fiduciary capacity pursuant to a trust instrument and accepted by the trustee in writing.  See Record Document 146 at 1-2.  Conversely, Newsome argues that Regions Bank's fiduciary duties to him commenced on March 17, 2014, the date Regions Bank was appointed corporate trustee, or on March 25, 2014, the date the first trust document was executed.  See Record Document 147 at 2.  This argument is based on the language set forth in this Court's Order of March 17, 2014, stating:

> **IT IS ORDERED** that Regions Bank is hereby appointed to serve as the corporate trustee over the settlement funds ***and property*** of Plaintiff Claude Allen Newsome.

Record Document 87 (emphasis added).  Thus, Newsome contends that Regions Bank had a duty to ensure that the amount Newsome received pursuant to the Order granting the Motion for Disbursement of Funds was consistent with the terms of the settlement agreement.  <u>See</u> Record Document 147 at 4-9; Record Documents 99 & 100.  During the evidentiary hearing, Newsome further argued that Regions Bank had a duty to investigate any potential claims against Gordon and/or to negotiate a trust instrument different from that devised by Gordon and Mendler.

After its review of Record Document 87, the Court finds that the text of its March 17, 2014 does lead to some confusion.  The intent of the Order was for the Trust to encompass only the net settlement proceeds from the instant action.  The Court did not envision that the Trust would encompass any other property; however, it is true that  the Trust may now, or at some point in the future, encompass property that has been purchased by the trustee for the benefit of Newsome with funds of the Trust.  Such property may include wheelchairs, cell phones, a handicap accessible van, a house, etc.  In the interest of avoiding any further confusion, the Court **AMENDS** its Order of March 17, 2014, such that its reads:

> **IT IS ORDERED** that Regions Bank is hereby appointed to serve as the corporate trustee over the net settlement funds of Plaintiff Claude Allen Newsome.

Additionally, this Court finds that Newsome's argument asserting some sort of implied trust  is unsupported by the Trust Code and Louisiana case law.  In Louisiana, all

trusts must be in writing.  See 11 La. Civ. L. Treatise § 3:2 (2d ed.)("The Trust Code requires a writing to create a testamentary or inter vivos trust, whether the subject matter is land or movables").  "A trustee is without authority until he affirmatively accepts the trust."  11 La. Civ. L. Treatise § 5:6 (2d ed.).  In Succession of McLean, 580 So. 2d 935 (La.App. 2nd Cir.), writ denied, 584 So. 2d 682 (La. 1991), the court held that the trustee's acceptance must be in writing.  See id. at 940.  The McLean based this holding on La. R.S. 9:1824.[18]  See id.  The writing requirement is also consistent with La. R.S. 9:2111 of the Trust Code, which provides:

> [A] trustee shall exercise only those powers conferred upon him by the provisions of the trust instrument or necessary or appropriate to carry out the purposes of the trust and are not forbidden by the provisions of the trust instrument.

La. R.S. 9:2111.  Likewise, a trustee's fiduciary duty only extends to those property interests transferred to it in the trust instrument.  See La. R.S. 9:1781 ("A trustee is a person to whom title to the trust property is transferred to be administered by him as a fiduciary."); see also Succession of Carriere, 216 So.2d 616, 618 (La.App. 4th Cir. 1968) ("Under the Trust Code, the trustee is vested with title to the trust property, which he must administer as a fiduciary.  The duties and powers of a trustee are determined from the contents of the trust instrument.").  In McLean,  580 So. 2d 935, the court explained:

> Acceptance [by the trustee] must be in writing and, once accepted, is retroactive to the date of creation of the trust.  La.R.S. 9:1823, 1824; Jackson v. D'Aubin, 338 So.2d 575, 580 (La.1976).  It is in this manner that title to

_____

[18]Section 1824 provides:

If the trustee was not a party to the trust instrument, he must accept the trust in writing within a reasonable time after its creation, or the proper court shall appoint a trustee.

property in a trust is transferred from settlor to trustee.  La.R.S. 9:1781; Reynolds v. Reynolds, 388 So.2d 1135 (La.1980) (on rehearing); Succession of Hines, 341 So.2d 42 (La.App. 3d Cir.1976).  A trust may come into being without transfer of legal interest to any particular trustee, but the trusteeship of a particular trust cannot begin until he has been given a property interest. Bogert, Trusts and Trustees § 141 (2d ed. 1979).

Id. at 940.

Based on the aforementioned legal standards, Regions Bank could not have assumed greater duties toward Newsome than those which it accepted in the written trust instrument.  Here, Craig settled the Trust with an initial contribution of $10.00.  At that time, the Trust "came into being." Id.  Then, Regions Bank, acting through Pierson, accepted the trust in writing, with the effect that title to the Trust's assets was transferred to Regions Bank retroactive to the date of the Trust's creation, whether that be on the date the first or second trust instrument was executed.  Regions Bank's trusteeship arose, but its duties and obligations were limited to the initial $10.00 contribution.  The trust instrument was then submitted to the Court on April 24, 2014.  See Record Document 99.  The Court approved the trust instrument on April 25, 2014 and ordered that the net settlement proceeds payable to Newsome be transferred to the Trust.  See Record Document 100.  Regions Bank, as corporate trustee, then accepted the additional property by endorsing the $3,879,935.67 check issued to it by the Clerk of Court.  No other property was transferred to the Trust. Thus, this Court holds that Regions Bank's fiduciary duties only extended to the initial contribution of $10.00 and the $3,879,935.67 in net settlement proceeds.

Newsome has cited to no legal authority to expand Regions Bank's limited fiduciary

duty to some general duty to manage Newsome's property interests as a whole.[19]  Other than Record Document 87, which has now been amended, Newsome provides no corroborating evidence for this position.  Again, the Court finds that trusteeship of the Trust is limited to the $10.00 and $3,879,935.67, the amounts received and accepted into the Trust.

Therefore, based on the foregoing analysis, this Court **DENIES** the Rule 60 (b) Motion (Record Document 125) and declines to recall and vacate Record Document 79, 87, and 100 as requested by Newsome and declines to release to Newsome the funds held by Regions Bank, as corporate trustee.  However, the Court **AMENDS** its Order of March 17, 2014, such that its reads:

> **IT IS ORDERED** that Regions Bank is hereby appointed to serve as the corporate trustee over the net settlement funds of Plaintiff Claude Allen Newsome.

While this Court agrees that Godley should be removed as Newsome's guardian ad litem/trustee over the person, she shall remain in place until such time as a new guardian ad litem/trustee over the person is appointed.[20]  The appointment process of the new

_____

[19]It appears that Newsome believes that Regions Bank had a duty not only to investigate potential claims against Gordon, but also to ensure that the disbursements of this Court and the trust instrument complied with the Settlement Agreement reached.  Without reaching the merits of any such claims, it is this Court's belief that such claims are more properly asserted by Newsome against Gordon in the context of disciplinary proceedings.  Newsome's ongoing disciplinary proceedings against Gordon were discussed during the evidentiary hearing.  If as a result of the disciplinary proceedings Newsome is awarded additional funds, including but not limited to funds returned due to a reduction of attorney's fees, it is this Court's belief that such funds shall be considered part of the net settlement proceeds of this case.  Thus, such funds belong to the Trust and must be deposited forthwith into the Trust.

[20]During the hearing, counsel for Godley requested that she be released as trustee over Newsome's person.  See Record Document 148 at 5.  Godley likewise testified that she did not want to be "trustee of Claude anymore."  Id. at 185.

guardian ad litem/trustee over the person will be discussed in the context of the Motion for Trustee's Instructions.

### B.   Motion for Trustee's Instructions.

Regions Bank, as the corporate trustee, has a duty to administer the Trust assets in accordance with the trust instrument and in a manner that is in the best interest of Newsome.  As set forth above, the Court has affirmed its past actions in creating the Trust and in funding the Trust with Newsome's net settlement proceeds.  The Trust will stay in effect moving forward.  Thus, the Court must reach Regions Banks' Motion for Trustee's Instruction, which requests guidance on issues relating to the administration of the Trust.[21]

### 1.   Guardian Ad Litem/Trustee over the Person and/or Contact Person/Responsible Party.

Regions Bank requests the Court to assist it in establishing, in consultation with Newsome, a clear chain of communication with respect to decisions that need to be made concerning his ongoing care and maintenance, including the whereabouts of certain SSDI

---

[21]In its Motion for Trustee's Instructions, Regions Bank asked the Court for trustee's instructions with respect to the following:

(a)   whether the court's orders appointing Regions Bank as trustee over the settlement funds and property of Newsome remain valid and enforceable orders;

(b)   whether the Trust Instrument is a valid and enforceable trust instrument under applicable federal and state law;

(c)   whether the Trust is a valid and enforceable trust under applicable federal and state law.

Record Document 110-1 at 6.  These questions were answered by the Court in its ruling on Newsome's Rule 60(b)(6) Motion.  Regions Bank also sought direction as to "which attorney, if any, represents Newsome's interests." Id. at 7.  The Court believes it is settled now that  Henry W. Kinney, Don M. Richard, and Aaron N. Maples of the law firm Kinney, Ellinghausen, Richard & DeShazo represent Newsome's interest.

payments, which should have been received by Newsome and used for his care.  <u>See</u> Record Document 110-1 at 7; Record Document 140 at 32-33.[22]  In his trial deposition, Dr. Katz testified that quadriplegics typically require a care manager or someone, such as a family member or even a paid custodian, who is committed to overseeing the individual's care and maintenance.  Other witnesses referred to such person as a life care specialist or a life care associate.

Additionally, a new guardian ad litem/trustee over the person must be appointed.

---

[22]Regions Bank believes Newsome is currently receiving Medicare and SSDI.  <u>See</u> Record Document 140 at 34.  Regions Bank has been informed that Newsome has declined to apply for Medicaid benefits, even though he may qualify for such benefits.  <u>See</u> <u>id.</u>  In fact, near the end of the evidentiary hearing, this Court had a colloquy with Mr. Kinney regarding Medicaid:

| | |
|---|---|
| THE COURT: | Have you qualified him for Medicaid in Mississippi? |
| MR. KINNEY: | Judge, he is not eligible for Medicaid - - |
| THE COURT: | I know that's your contention.  Have you attempted to qualify him? |
| MR. KINNEY: | No, because, Judge, if – we want the trust dissolved.  Okay?  If he has 3 point – but after we get finished with Mr. Gordon - - |
| THE COURT: | I understand and – I fully understand your position that you have not sought to qualify him because, in your opinion, he doesn't qualify because you're trying to dissolve the trust. |
| | I will – this is a cautionary statement only: If that proves to be wrong, you may have set yourself up for some additional discussions on the advice.  I don't know.  Because it's costing him money out of the trust. |

Record Document 149 at 476-477.  In order for Regions Bank to manage the trust funds prudently over the long term, this Court agrees that it needs more information regarding Newsome's current care and maintenance costs and eligibility for means-tested government benefits.  <u>See id.</u>

See Record Document 110-1 at 6-7; Record Document 140 at 32-33.  It is simply unclear to the Court, at this stage, if a single person could fulfill both of these roles.  A telephone status conference is hereby set for **July 15, 2015** at **2:00 p.m.** to discuss the remaining issues surrounding a new guardian ad litem/trustee over the person and/or a life care specialist.  The Court suggests that counsel for Regions Bank and counsel for Newsome research these issues, such that a final decision may be made in short order.

### 2.    Attorneys' Fees.

Since the dismissal of this case on May 7, 2014 (Record Document 102), Newsome has engaged a series of counsel regarding his rights in relation to the Trust, including Woodfield of Gulfport, Mississippi, and his current counsel, Henry W. Kinney, Don M. Richard, and Aaron N. Maples of the law firm Kinney, Ellinghausen, Richard & DeShazo. Woodfield, whom Newsome terminated sometime in November 2014, has submitted an invoice to Regions Bank for his services.  Regions Bank is also unclear how Newsome intends to compensate his current counsel.  Regions Bank requests the Court to instruct it as to whether the past and future fees and expenses of Woodfield and Newsome's current counsel should be paid out of the funds in the Trust.  In addition, according to Regions Bank, Newsome's current counsel has specifically objected to Regions Banks' attorney's fees and expenses being paid out of the funds in Trust.

The trust instrument states:

[T]he Trustee shall have the following powers which shall be exercised in the best interest of the beneficiary:

K.    To select and employ, and to pay from trust funds, any person, firm or entity **to assist in the performance of the Trustee's duties**, including but not limited to investment counsel, legal counsel, accountants and professional advisors knowledgeable

> on the subject of the availability of public or private benefits
> and/or the administration of special needs trusts. Nothing in
> this authorization shall be construed as requiring the Trustee
> either to seek or to follow such advice.

Record Document 99-3 at 7 (Section 4.2(K) of the Trust Instrument) (emphasis added).

Based on Section 4.2(K) of the trust instrument, this Court believes that Regions Banks'

retention of counsel was done for the purpose of assisting the trustee in the performance

of its duties.  Thus, Regions Bank is permitted to pay its retained counsel their fees and

expenses in this matter out of the funds in Trust.  However, the payment of the legal fees

of Woodfield and Newsome's current counsel from trust funds is not as clear.

The Court has before it the invoice of Woodfield seeking $12,735.00 in fees.  <u>See</u>

Regions 20; Record Document 148 at 205.  The Court is mindful of Gustavson's testimony

that she spoke with Woodfield often and that "his appearance was . . . helpful, because it

helped facilitate some communication with [Newsome] that needed to happen."  Record

Document 148 at 199, 203-204.  Gustavson further testified that she initially "wrote up a

discretionary request" for Woodfield's invoice, but "became concerned that the trust

instrument didn't expressly allow the trustee to pay attorney's fees for attorneys that [were]

hired by [Newsome] for the purposes of litigation or the like."  <u>Id.</u> at 206.  The Court does

not have a detailed invoice before it from Newsome's current counsel, as the submission

of such an invoice would appear premature at this stage.

As noted by Regions Bank, this Court believes that Newsome has the legal right to

challenge the validity of the instant Trust and/or to seek the removal of the trustee over the

person/guardian ad litem.  <u>See</u> Record Document 140 at 21, n. 6.  However, this Court is

unaware of a provision in the trust instrument for the payment of legal fees related to such

legal action, as compared to Section 4.2(K) which allows the trustee to employee, and pay

from trust funds, any person, firm or entity to assist in the performance of the Trustee's duties.  This Court simply needs additional information from the parties before the issue relating to the payment from trust funds of the invoices of Woodfield and Newsome's current counsel can be resolved.  Counsel shall be prepared to discuss this issue at the July 15th telephone status conference and should be prepared to file additional briefs on this issue.

## CONCLUSION

Based on the foregoing analysis, the Court hereby **DENIES** Newsome's Motion for Relief from Orders Pursuant to Rule 60 of the Federal Rules of Civil Procedure (Record Document 125), as he has not met his burden of establishing the exacting substantive requirement under Rule 60(b).  The Court hereby **AMENDS** its Order of March 17, 2014, such that the word "net" is added and the phrase "and property" is removed.  Finally, the Court **GRANTS** Regions Bank's Motion for Trustee's Instructions (Record Document 110) as set forth above.  A follow-up telephone status conference to address remaining issues raised in Regions Bank's Motion is hereby set for **July 15, 2015** at **2:00 p.m.**

**IT IS SO ORDERED.**

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 29th day of June, 2015.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE